In re Attorney Lori E. LIGHTFOOT.

No. D–00–0002.

United States Court of Appeals, Seventh Circuit.

Hearing April 18, 2000.

Decision May 19, 2000.

Before: POSNER, Chief Judge, and CUDAHY and DIANE P. WOOD, Circuit Judges.

POSNER, Chief Judge.

At the end of our opinion in *Lindstrom v. Graber*, 203 F.3d 470 (7th Cir.2000), we directed Assistant U.S. Attorney Lori Lightfoot to show cause why she should not be disciplined for conduct unbecoming a member of the bar of this court. Fed. R.App.P. 46(c). She responded by submitting a brief and a number of supporting documents, including testimonials to her character from lawyers whom she has appeared opposite to in court, and the Department of Justice submitted an amicus curiae brief in her support. At her request we held an oral hearing at which she, her lawyer, and the U.S. Attorney for the Northern District of Illinois presented argument to us and answered our questions.

The facts leading up to this disciplinary proceeding are recounted in our previous opinion, familiarity with which is assumed. Briefly, on August 19 of last year, at about 1:00 p.m., the U.S. Marshals Service, equipped with a certification of extraditability and a surrender warrant, brought Lars Lindstrom to the garage of the federal courthouse in Chicago, where they met two Norwegian policemen. A marshal drove Lindstrom and the two Norwegians (Lindstrom is Swedish) to O'Hare Airport. They had tickets to fly to Norway on a plane scheduled to depart at 5:00. At 2:20, about twenty minutes after the marshal and his passengers arrived at O'Hare, Lindstrom's lawyer applied to this court for an emergency stay of extradition, which Judge Rovner granted forthwith in order to have time to consider the merits of a stay pending appeal of an order that

the district court had issued denying Lindstrom's petition for habeas corpus. Assistant U.S. Attorney Lightfoot, who was handling the government's defense against Lindstrom's challenge to his extradition, was notified by this court of Judge Rovner's grant of the stay at 2:55. After consulting with Deputy U.S. Attorney Joan Safford, who is in charge of international affairs for the U.S. Attorney's office for the Northern District of Illinois and who in turn consulted Randy Toledo, a lawyer in the Office of International Affairs in the criminal division of the Justice Department in Washington, Lightfoot at 4:40 p.m. filed with the court a motion to lift the stay that Judge Rovner had granted. The motion was referred to Judge Rovner and by her immediately denied, but by the time word of the denial was relayed to the marshal who had driven Lindstrom and the Norwegian policemen to the airport, the plane had left with the trio on it. As we held in our previous decision, Lindstrom's departure from the territory of the United States mooted his challenge to his extradition to Norway.

■ Safford and Toledo advised Lightfoot during the afternoon of August 19 that the extradition had occurred at the meeting with the Norwegian policemen in the garage of the federal courthouse, and so the stay of extradition granted by Judge Rovner was moot. We rejected this position in our previous opinion without finding it necessary to determine when "extradition" occurs—whether it is when formal custody over the person to be removed from the jurisdiction is transferred to the agents of the jurisdiction to which he or she is being extradited, or when the paperwork incident to the transfer of custody takes place, or when the person boards the plane, or when the plane takes off, or when the plane leaves the airspace of the extraditing jurisdiction. Indeed, each of these events might be "extradition" for particular purposes. What seemed clear to us, and what we take this opportunity to repeat in view of doubts intimated in the briefs, is that the courts of the extraditing jurisdiction, in this case the federal courts, do not lose jurisdiction over the person of the individual to be extradited as long as he is still within United States territory. Our garage did not become Norway when Lindstrom entered the car with the Norwegian police; nor did O'Hare become Norway when he and his captors arrived there.

Our ruling established the power of Judge Rovner to issue a stay even though Lindstrom was already at O'Hare when she issued it. The remaining question was the sense in which her stay order used the word "extradition." It seemed obvious to us that she meant it to mean removal from the United States rather than the rendezvous in the garage. The purpose of the stay, after all, was to allow the court to consider Lindstrom's appeal from the denial of his petition for habeas corpus, and that purpose would be thwarted if the stay were interpreted as an empty gesture.

■ All this seems to us so clear that the contrary advice tendered by Safford and Toledo was not only unsound, but unreasonable. But the taking of unreasonable positions in a litigation, while sometimes sanctionable under the various rules designed to protect courts and litigants from frivolous and vexatious litigation and other abuses of judicial process, is not in itself conduct unbecoming a member of the bar. Defined by the Supreme Court as "conduct contrary to professional standards that shows an unfitness to discharge continuing obligations to clients or the courts, or conduct inimical to the administration of justice," *In re Snyder,* 472 U.S. 634, 645, 105 S.Ct. 2874, 86 L.Ed.2d 504 (1985), conduct unbecoming within the meaning of Rule 46(c) has generally been understood to involve significant elements of aggravation, such as deliberately misleading the court or displaying egregious misjudgment. *Cleveland Hair Clinic v. Puig,* 200 F.3d 1063, 1069–70 (7th Cir. 2000); *Mays v. Chicago Sun–Times,* 865 F.2d 134, 140 (7th Cir.1989); *In re Jafree,*

759 F.2d 604 (7th Cir.1985) (per curiam); *Braley v. Campbell*, 832 F.2d 1504, 1508–10 and n. 5 (10th Cir.1987) (en banc); *In re Bithoney*, 486 F.2d 319, 322–23, 325 (1st Cir.1973). Granted, negligence has been deemed sufficient in a number of cases. E.g., *In re Hendrix*, 986 F.2d 195, 201 (7th Cir.1993); *DCD Programs, Ltd. v. Leighton*, 846 F.2d 526 (9th Cir.1988) (per curiam). But these are cases involving misrepresentations, omissions, or failures of inquiry, rather than poor judgment in applying legal principles to facts; and without circumstances of aggravation, poor judgment is not professional misconduct. We didn't find circumstances of aggravation in Safford and Toledo's advice, and so we didn't institute disciplinary proceedings against either of those lawyers.

 The motion filed by attorney Lightfoot, a motion that she prepared (albeit with advice from Safford) and signed, presents a more troublesome issue. The trouble lies in the fact that the motion was misleading. It is one thing for a lawyer to advocate an unreasonable position to a court; usually the court can prevent any serious harm to anyone just by rejecting the position. It is another thing for a lawyer to defeat an opposing party's claims by misleading the court, whether by a misrepresentation or by a pregnant omission. That is misconduct, *In re Cook*, 49 F.3d 263 (7th Cir.1995); *Pearson v. First NH Mortgage Corp.*, 200 F.3d 30 (1st Cir.1999); *United States v. Shaffer Equipment Co.*, 11 F.3d 450, 453–61 (4th Cir. 1993); *Malautea v. Suzuki Motor Co.*, 987 F.2d 1536, 1540–41, 1544–46 (11th Cir. 1993), and is what happened here. To the extent, unilluminated by the record, that Safford was (as Lightfoot argues) complicit in Lightfoot's violation of the duty of candor, the fact that Safford is Lightfoot's superior would not get Lightfoot off the hook. Reliance on a superior's orders is a defense to a charge of misconduct only when reasonable, *In re Howes*, 123 N.M. 311, 940 P.2d 159, 164–65 (N.M.1997) (per curiam); ABA Model Rule of Professional Conduct 5.2, comment [2] (1995), and it is not reasonable to believe that one is authorized to mislead a court. *People v. Casey*, 948 P.2d 1014, 1016–17 (Colo.1997) (per curiam).

The motion that Lightfoot filed asked this court to lift the stay that had been "imposed regarding the surrender of Lars Lindstrom to Norwegian authorities." The natural meaning to be ascribed to this statement is that the government interpreted the stay to be a prohibition against allowing the Norwegians to remove Lindstrom from the United States and thus from the court's jurisdiction. The ground on which Lightfoot asked that the stay be lifted was that Lindstrom's appeal from the denial of his petition for habeas corpus was frivolous. After explaining this, the motion notes that when the government learned about the issuance of the stay "Lindstrom was already in Norwegian custody and is presently [i.e., at 4:40 p.m. on August 19, when the motion was filed] awaiting a 5:00 departure to Norway." Therefore, the motion continues, to give effect to the stay "would require the United States government to take Lindstrom back into custody, contrary to the Secretary of State's duly issued surrender warrant." For these reasons—that is, because the appeal was frivolous and Lindstrom already in Norwegian custody and scheduled to depart shortly, so that to comply with the stay the government would have to take him back into U.S. custody—the motion asks the court to "reconsider its order to enter a temporary stay in this case and lift that stay." The motion concludes with a request that should the court deny the motion, the government be permitted to file a further response.

Anyone reading this motion would suppose that the government understood the stay to be a prohibition against Lindstrom's being removed from the United States. Otherwise there would be no reason to offer his imminent departure as a reason not for vacating the stay as moot,

but for lifting it so that he could be removed on schedule. The implication was that unless the stay was lifted the Norwegians could not carry off Lindstrom on the 5:00 p.m. flight. If the stay did not have that effect and thus was going to become moot in 20 minutes (if it wasn't moot already), there would be no reason to request time for a further response should the motion be denied. Yet the motion made that request. The motion thus created a thoroughly false impression of the government's position, an impression that could not but cause Judge Rovner to believe that unless she vacated the stay Lindstrom would remain in the United States until the merits of his appeal could be considered. The impression was false because we know that the Justice Department was proceeding on the premise that the stay which Judge Rovner had issued did not stay the removal of Lindstrom from the United States—the stay had no effect, was moot, would not prevent the 5:00 p.m. departure. Had Judge Rovner received timely notice that her stay was being so interpreted by the officials to whom it was directed, she would no doubt have issued a further order making clear that the stay was a stay of removal and not merely of some metaphysical act of "extradition" that had occurred hours before in the basement of the federal courthouse. Had Lightfoot's motion informed the court that unless it took further action Lindstrom would be on his way to Norway within minutes, Judge Rovner might have issued an order directly to the airline, and the order might have been timely; for the motion was filed at 4:40, and the plane didn't take off until 5:45. Of course it would have been much better had Lightfoot informed the court of the Justice Department's interpretation of the stay much earlier; for remember that she learned before 3:00 p.m. that the stay had been issued.

■ For a government lawyer to file with a court a misleading statement the effect of which is to moot a petition for habeas corpus is professional misconduct. Lightfoot's motion was bound to lull Judge Rovner into thinking that the stay had had the intended effect of preventing Lindstrom's appeal from becoming moot.

Because the motion was (and had to be) filed hurriedly, and Lightfoot had received misleading advice from her superiors concerning a novel situation that she had never before confronted, and because her record as a lawyer is otherwise unblemished, as attested by the glowing testimonials that we have received concerning her character and her professional competence and performance, we do not think a severe sanction, such as suspension or disbarment from the bar of this court, or a recommendation to Illinois's Attorney Registration and Disciplinary Committee for disciplinary action, is warranted. We are disposed instead to regard the episode as an isolated lapse deserving only of a reprimand. We are more troubled by the attitudes and behavior of the Justice Department. The U.S. Attorney for the Northern District of Illinois in his brief and in his oral statement at the disciplinary hearing emphasized the importance of hierarchy in the Justice Department. The inference we draw is not the intended one, but that the more serious misconduct in this matter was institutional rather than personal. Considering that extradition to foreign countries is not a novel or infrequent occurrence, we are surprised to read in the U.S. Attorney's amicus brief that "it did not occur to AUSA Lightfoot *or her supervisor* at that time [i.e., after custody of Lindstrom had been transferred to the Norwegians but before the plane took off] that this Court could issue any further orders to stop the already completed extradition" (emphasis added). Remember that the supervisor in question was the Deputy U.S. Attorney who is in charge of international matters in the U.S. Attorney's office and that she was consulting a specialist in the Justice Department's home office. If the foreign-relations implications of extradition are, as the Department argues, so sensitive that line prosecu-

tors should not be permitted to act save by direction of their supervisors, one might have expected the Department to equip the supervisors with the relevant expertise. So frayed was the chain of command that the Department is able to advise us only that "Safford and Lightfoot *believed* that [the Office of International Affairs in home Justice] had advised them that a court could not enter a stay once custody had passed to the Norwegian police" (emphasis added)—not that the Office of International Affairs had *in fact* advised them of this. The communications from that office submitted with Lightfoot's brief do not even concern that issue.

We are troubled, finally, by the U.S. Attorney's request that we "depublish" our previous decision. Even if we agreed with him, as we do not, that attorney Lightfoot should not be disciplined, he has presented no reasons for supposing that our decision contained any error. We did not say that Lightfoot had engaged in conduct unbecoming a member of the bar, but only that there was a sufficient likelihood of this to require a disciplinary proceeding; and nothing in the U.S. Attorney's submission suggests that this "probable cause" finding was erroneous. The request to vacate our decision, which we of course deny, suggests to us that the U.S. Attorney still does not appreciate the gravity of the situation demonstrated by the uncontested facts, which reveal that the Justice Department's failure to equip its attorneys with the necessary expertise to opine on difficult issues relating to extradition precipitated the filing of a misleading motion by the Department that caused this court to lose jurisdiction over an appeal by a person who claims that he had been ordered extradited in violation of law.